**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| **AUTH TOKEN LLC,**<br><br>  Plaintiff,<br><br>v.<br><br>**FISERV, INC.,**<br><br>  Defendant. | Civil Action No.:  1:22-cv-00420<br><br>**TRIAL BY JURY DEMANDED** |

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiff Auth Token LLC ("Plaintiff"), through its attorneys, complains of Fiserv, Inc. ("Defendant"), and alleges the following:

**PARTIES**

2. Plaintiff Auth Token LLC is a corporation organized and existing under the laws of Delaware that maintains its principal place of business at 261 West 35th Street, Suite 1003, New York, NY 10001.

3. Defendant Fiserv, Inc. is a corporation organized and existing under the laws of Wisconsin, with a principle place of business located at 255 Fiserv Drive, Brookfield, WI 53045. Upon information and belief, Defendant maintains an established place of business in this District at 8310 North Capital of Texas Hwy, Prominent Pointe, Bldg. 2, Suite 250, Austin, TX 78731. Upon information and belief, Defendant may be served via its Registered Agent c/o Corporation Service Company, 8040 Excelsior Drive – Suite 400, Madison, WI 53717.

**JURISDICTION**

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

5. This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District and has an established place of business in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

**VENUE**

7. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant has an established place of business in this District. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

**PATENT-IN-SUIT**

8. Plaintiff is the assignee of all right, title and interest in United States Patent No. 8,375,212 (the "'212 Patent" or the "Patent-in-Suit"); including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the Patent-in-Suit. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Patent-in-Suit by Defendant.

**THE '212 PATENT**

9. The '212 Patent is entitled "Method for personalizing an authentication token," and issued 2013-02-12. The application leading to the '212 Patent was filed on 2010-12-27. A true and correct copy of the '212 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Plaintiff is presently the owner of the '212 Patent, having received all right, title and interest in and to the '212 Patent from the previous assignee of record. Plaintiff possesses all

rights of recovery under the '212 Patent, including the exclusive right to recover for past infringement.

11. To the extent required, Plaintiff has complied with all marking requirements under 35 U.S.C. § 287 with respect to the '212 Patent.

12. One claimed invention in the '212 Patent pertains to an authentication token using a smart card. Ex. 1 at Col.1:13-14.

13. As identified in the '212 Patent, prior art systems had technological faults. See Ex. 1 at Col.1:16-Col. 4:10.

14. Prior art systems were familiar with the authentication of remote users in order to enforce secure access control. Ex. 1 at Col. 1:16-17.

15. However, prior art failed to provide personalized authentication in a multi-party environment. The increase in smart-card computing capabilities created new risk for organizations as applications could then be loaded into a smart-card's Electrically Erasable Programmable Read Only Memory (EEPROM) *after* manufacture (i.e. they can be subsequently removed or replaced allowing upgraded applications to be delivered onto the smart cards even after they have been issued to end users). See Ex. 1 at Col. 3:37-45.

16. The ability to have the cards personalized after issuance, lead to an increase in the need to remotely personalize the authentication in a manner that is secure and not at risk for third party interference.

17. Prior art systems and methods ranged from single factor authentication (such as use of a password) to multiple factor authentication (such as use of a physical token in conjunction with a Personal Identification Number (PIN)). See Ex. 1 at Col. 1:18-21.

18. Prior art also identified a variety of tokens that can fulfill the role of the second factor ('something you have'). One exemplary approach was a method of having a series of password each of which can only be used once. See Ex. 1 at Col. 2:27-29.

19. This process used a cryptographic process to generate a one-time password dynamically when it is needed. See Ex. 1 at Col. 2:34-36.

20. Additionally, Smart cards, at the time of invention were in use for a variety of purposes including financial products. See Ex. 1 at Col. 2:49-50.

21. However, they had limited processing capabilities. See Ex. 1 at Col. 2:66-Col. 3:4.

22. As of the '212 Patent's priority date, the newest smartcards were EMV (credit/debit card functionality defined jointly by Europay/MasterCard/Visa) cards that took advantage of improved capabilities to provide better security features. See Ex. 1 at Col. 3:5-9.

23. Subsequently, multi-application smart card operating systems were developed, requiring only the operating system itself to be hardwired into a smart-card's Read Only Memory (ROM). See Ex. 1 at Col. 3:10-13.

24. Because of this new environment, applications can now be loaded into a smart-card's EEPROM after manufacture and they can be removed or replaced even after they have been issued to end users. See Ex. 1 at Col. 3:37-45.

25. In sum, the technological advances in smart-card processing ability, resulted in a computer-centric or network-centric problem (or opportunity) related to an organization's ability to authenticate remote users and provide continued secure access control in a multi-party environment in a personalized manner *after issuance*. As noted during the prosecution of the '212 Patent, prior art did not teach or provide for the ability to lock the authentication token, thereby reducing the risk of third party removing or replacing the personalized authentication.

26. Claim 1 of the '212 Patent is a practical application and inventive step of technology that address these aforementioned specific computer-centric problems associated with computer-centric or network-centric problem (or opportunity) related to an organization's ability to authenticate remote users and provide continued secure access control in a multi-party environment in a personalized manner *after issuance*. As noted during the prosecution of the '212 Patent, prior art did not teach or provide for the ability to lock the authentication token, thereby reducing the risk of third party removing or replacing the personalized authentication.

27. Claim 1 of the '212 Patent states:

> "1. A method for personalizing an authentication token comprising:
> entering by the authentication token into personalization mode;
> requesting from the authentication token, by a personalization device in communication with the authentication token, a serial number of the authentication token;
> encrypting by the personalization device the serial number using a personalization key, and forwarding the encrypted serial number to the authentication token from the personalization device;
> decrypting by the authentication token of the encrypted serial number, and validating by the authentication token that the personalization key is correct;
> establishing an encrypted session between the authentication token and the personalization device using a trans port key:
> sending to the authentication token, by the personalization device, an initial seed value and an initial Secret key using the transport key to encrypt the initial seed value and the initial secret key, the initial seed value and the initial Secret key for facilitating an initial interaction between the authentication token and an interface device; and
> storing by the authentication token the initial seed value and the initial secret key after decryption thereof by the authentication token using the transport key, wherein, once the authentication token is personalized with the initial seed value and the initial secret key, the authentication token can no longer enter the personalization mode. Ex. 1 at Col.10:66 – Col. 12:7.

28. Specifically, Claim 1 of the '212 Patent provides a solution to the previous network-centric or internet-centric problems inasmuch as it provides for more robust authentication where, regardless of the smartcard used, the application is personalized to ensure the correct data is stored on the card's EEPROM along with an initial unique consumer code. See Ex. 1 at Col. 5:52-55.

29. Once personalized, "the authentication token can no longer enter the personalization mode." See Ex. 1 at Col. 12:6-7.

30. The specific elements of claim 1, as combined, accomplish the desired result of improve functionality in smartcard security and personalization. *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018) (holding that improving computer security can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem). See also *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018); *Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018); *Uniloc USA, Inc. v. LG Electronics USA*, Inc., 957 F.3d 1303 (Fed. Cir. April 30, 2020).

31. Claim 1 of the '212 Patent provides meaningful details on how to implement its system, and thus adds something inventive.

32. Importantly, during the prosecution of the '212 patent, Claim 1 was allowed after the applicant amended the claims to include specific limitations relating to the personalization modes and their ordered operation. See Exhibit 2, '212 Notice of Allowance at Page 6 and Applicant's Amendment at Pages 18-19.

33. Specifically, Claim 1 of '212 patent was allowed with a limitation that "once the authentication token is personalized with the initial seed value and the initial secret key, the authentication token can no longer enter the personalization mode. *Id.*

34. Thus, the "how to implement" the system of Claim 1 of the '212 Patent corresponds to the USPTO's reasons for allowance. "How" the system operates in an inventive way is the additional security provided for a multi-party environment wherein Claim 1 specifically requires that once the authentication token is personalized with the initial seed value and the initial secret key, the authentication token can no longer enter the personalization mode. *Id*.

35. Claims need not articulate the advantages of the claimed combinations to be eligible. *Uniloc USA, Inc. v. LG Elecs. USA, Inc*., 957 F.3d 1303, 1309 (Fed. Cir. 2020).

36. These specific elements of Claim 1 of the '212 Patent were an unconventional arrangement of elements. *Cellspin Soft, Inc. v. FitBit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019).

37. Further, regarding the specific non-conventional and non-generic arrangements of known, conventional pieces to overcome an existing problem, the system of Claim 1 in the '212 Patent provides a system that would not preempt all ways of improving security in a multi-party environment. *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); See also *DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245 (Fed. Cir. 2014).

38. Based on the allegations, it must be accepted as true at this stage, that Claim 1 of the '212 Patent recites a specific, plausibly inventive computer implemented system for authenticating remote users and providing continued secure access control in a multi-party environment in a personalized manner *after the issuance of a smart card. Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019), cert. denied sub nom. *Garmin USA, Inc. v. Cellspin Soft, Inc.*, 140 S. Ct. 907, 205 L. Ed. 2d 459 (2020).

39. Alternatively, there is at least a question of fact that must survive the pleading stage as to whether these specific elements of Claim 1 of the '212 Patent were an unconventional arrangement of elements. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121

(Fed. Cir. 2018) See also *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), cert. denied, 140 S. Ct. 911, 205 L. Ed. 2d 454 (2020).

## COUNT 1: DIRECT INFRINGEMENT OF THE '212 PATENT

40. Plaintiff incorporates paragraphs 1-39, herein by reference.

41. Upon information and belief, Defendant is a vendor of financial products and services to non-party The Bank of New York Mellon Corp. ("BNY Mellon").

42. Defendant has been and continues to directly infringe one or more claims of the '212 Patent, in at least this District, by making, using, offering to sell, selling and/or importing, without limitation, at least the Defendant products identified in the charts incorporated into this Count below (among the "Exemplary Defendant Products") that were made in a way that infringes either literally or by the doctrine of equivalents at least the exemplary claims of the '212 Patent, such as Claim 1; see the charts of Exhibit 3 and Exhibit 4 incorporated herein (the "Exemplary '212 Patent Claims").

43. On information and belief, numerous other devices or systems the perform a method that infringes the Exemplary '212 Patent Claims have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

44. Defendant also has and continues to directly infringe, literally or under the doctrine of equivalents, the Exemplary '212 Patent Claims, by having its employees internally test and use the methods associated with these Exemplary Products.

45. The service of this Complaint, in conjunction with the attached claim charts and references cited, constitutes actual knowledge of infringement as alleged here. Moreover, upon information and belief, Defendant has had knowledge of the infringement, given its relationship

as the vendor of the instrumentality to accomplish the method of Claim 1 of the '212 Patent to customers including but not limited to BNY Mellon.

46. Despite such actual knowledge, Defendant continues to make, use, test, sell, offer for sale, market, and/or import into the United States, products that infringe the '212 Patent. On information and belief, Defendant has also continued to sell the Exemplary Defendant Products and distribute product literature and website materials inducing end users and others to use its products in the customary and intended manner that infringes the '212 Patent. This includes, but is not limited to, BNY Mellon. See also Exhibit 4 (demonstrating how Defendant has created the Exemplary Defendant Products on behalf of BNY Mellon in a manner that infringes Claim 1 of the '212 Patent).

## COUNT 2: INDUCED INFRINGEMENT OF THE '212 PATENT

47. Plaintiff incorporates paragraphs 1-39, herein by reference

48. At least since being served by this Complaint and corresponding claim charts, Defendant has actively, knowingly, and intentionally continued to induce infringement of the '212 Patent, literally or by the doctrine of equivalents, by performing a method to make the Exemplary Defendant Products that infringes one or more claims of the '212 Patent and provide the same to their customers for use in end-user products in a manner.

49. Upon information and belief, Defendant's customers include but are not limited to BNY Mellon.

50. In violation of 35 U.S.C. §271(f), Defendant has induced BNY Mellon to infringe the '212 Patent in violation of 35 U.S.C. §271(g) by selling the Exemplary Defendant Products made by Defendant.

51. Exhibit 3 includes charts comparing the Exemplary '212 Patent Claims to the Exemplary Defendant Products being used and implemented by one of its customers, namely BNY. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the '212 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary '212 Patent Claims.

52. Plaintiff therefore incorporates by reference in its allegations herein the claim charts of Exhibit 3 & 4.

53. Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement.

## JURY DEMAND

54. Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A judgment that the '212 Patent is valid and enforceable

B. A judgment that Defendant has infringed directly and indirectly one or more claims of the '212 Patent;

C. An accounting of all damages not presented at trial;

D. A judgment that awards Plaintiff all appropriate damages under 35 U.S.C. § 284 for Defendant's continuing or future infringement, up until the date such judgment is entered with respect to the Patents-in-Suit, including pre- or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

E. And, if necessary, to adequately compensate Plaintiff for Defendant's infringement, an accounting:

   i. that this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys' fees against Defendant that it incurs in prosecuting this action;

   ii. that Plaintiff be awarded costs, and expenses that it incurs in prosecuting this action; and

   iii. that Plaintiff be awarded such further relief at law or in equity as the Court deems just and proper.

Dated: May 5, 2022                                Respectfully submitted,

                                                  SAND, SEBOLT & WERNOW CO., LPA

                                                  */s/ Howard L. Wernow*
                                                  Howard L. Wernow (Bar No. 0089019)
                                                  Aegis Tower – Suite 1100
                                                  4940 Munson Street NW
                                                  Canton, Ohio 44718
                                                  Telephone: (330) 244-1174
                                                  Facsimile: (330) 244-1173
                                                  Email: howard.wernow@sswip.com

                                                  ATTORNEY FOR PLAINTIFF